The argument is 20-1830 TR International Trading v. United States. We have another Mr. Peterson. Welcome. Whenever you're ready, sir. Thank you, Your Honor. May it please the court, my name is John Peterson. I'm counsel for TR International Trading Company, the appellant in this case. Last year, in the case of Suncream v. United States, an en banc panel of this court held that United States Customs and Border Protection has the right to suspend liquidation of customs entries based on a suspicion that goods may be subject to the scope of an outstanding anti-dumping or countervailing duty order. However, what the court anticipated based on its determination was that the question of whether something was within the scope of a dumping order would be turned over to the Commerce Department for determination. The court in Suncream said Customs makes a yes or no answer as to whether an order applies, but this does not invade the interpretive powers of Commerce, and it also said this is not an interpretive act that would modify Commerce's determinations or otherwise impinge on Commerce's authority to issue and set the scope of dumping duties. May it please the court. This case raises the question of whether there are any limitations on Suncream. Now, we agree, we don't contest, Customs has a power to suspend liquidation of an entry if they suspect the merchandise is within the scope of a dumping or countervailing duty order. In this case, however, Customs sort of acted as judge, jury, and executioner. They never referred the matter to the Commerce Department, and they never gave TR International an adequate opportunity to turn it over to the Commerce Department for determination of scope. Our client had made 17 entries of citric acid anhydrous from India. Now, Indian citric acid is not subject to any dumping or countervailing duty determination. Customs suspended the liquidation of these products back on November 1st, 2018, saying this is an anti-dumping, countervailing duty suspension. If I can interrupt you, Mr. Peterson, I mean, this is very confusing to me. Are you saying that only Commerce could make this country of origin determination? So that's like going to Customs was not the way to go? Is that the right explanation? That's correct, Your Honor. I mean, there were anti-dumping orders in place against citric acid from China and from India. No product was manufactured in India. Now, Customs seems to have been of the assumption that, number one, the operations performed in India did not affect the substantial transformation of the constituent materials. They also seem to be of the impression, with no evidence whatsoever to back it up, that those constituent materials originated in China. They did not. This would be in the nature of a type of scope ruling known as an anti-circumvention ruling. And that's clearly the province of the Commerce Department. I guess I'm really not understanding it. I mean, the fact of where the citric acid originally came from is a finding that Commerce can, that Customs can make, and that can be protested, right? Not for purposes of anti-dumping duties, Your Honor. This is a question of whether, if you were to assume that the raw materials were Chinese, then the question would be, does the further processing done in India take it outside the scope of the dumping order or bring it inside the scope? That would be something within the province of Commerce through an anti-circumvention scope ruling. And it's not within the Commerce. Mr. Peterson, this is Judge Hughes. Are you saying that if Customs gets documentation, and I know this is probably not the facts of your case, but let's just assume that if Customs gets documentation that shows these products may have undergone some manufacturing in India, but it's clear the underlying citric acid came from China, but nevertheless, the importer enters them as coming from India, not subject to the anti-dumping orders, that Customs can't look at that and say, clearly the China anti-dumping duty order applies, and you have to pay duties under that, that you have to take the importer's statements on face value? No, Customs can say, we think it applies, but they have to turn the matter over to the Commerce Department so that Commerce can decide whether... Why? What legal authority, or why doesn't Supreme 3 say that Customs can make that determination, and then it's up to the importer to challenge it, either as a protest, or for the importer to request a scope ruling? Well, Your Honor, it would be possible for the importer to request a scope ruling, but under the circumstances of this case, it really wasn't possible. The first time that they suspended liquidation was November 1, 2018, where they said this is possibly subject to anti-dumping duties. Now, by that time, it's not clear that we could have gone to Commerce for a scope ruling, because Commerce had already... Why not? Well, because Commerce had... Why not? Well, two reasons. First, Your Honor, Commerce had already concluded the annual reviews of citric acid from China with a period covered by our entries, and if you look at the determination of this court in Eugene et al.'s Belgium versus United States, Commerce will not make a scope determination if the annual review process, if the administrative process, is finished, number one. Number two, let's assume that we had gone on November 1st or on November 2nd of 2018 to Commerce and said, we need a scope determination. Commerce normally takes 45 days to initiate a scope review, very often extending that period, but Customs foreclosed us 36 days later. Well, Mr. Peterson, I'm a little confused about that. Firstly, there's some dispute about the dates, right, and the claim whether it was in October based on emails, but even leaving that aside, the CIT here found, did it not, that there was an existing suspension of liquidation, and that suspension would have been continued pending the scope inquiry upon its initiation, and it wasn't impossible for Commerce to have had time to initiate a scope inquiry before liquidation, so the request wouldn't be incapable of producing any results. Well, Your Honor, even if we had, under the facts of this case, when Customs liquidated the entries with dumping assessments on December 7th of 2018, the Commerce road was foreclosed. But we don't know if Commerce or if Customs would have liquidated if you'd initiated a scope ruling. You didn't try to initiate a scope ruling with Commerce and see if Customs would suspend liquidation further. That's the problem. You're arguing that your failure to take an action is what rendered C unavailable to you and made I available, but that's never been the case, that a failure to exhaust an administrator may sometimes make I available. Well, see, I disagree, Your Honor, with the analysis, because if you look at the governing regulation, section 351.225, subsection L1 says if there's an existing suspension of liquidation, then Commerce scope determination might apply to that. There was no existing suspension of liquidation, as far as we're concerned, for November 1. So had we tried to go for a scope ruling before November 1, it would not have applied to our Okay, so then if you say, well, okay, as of November 1, when you had a suspension for dumping and countervailing duty reasons, you could have gone, again, number one, I question whether Commerce would have initiated a scope determination, because under the Eugene and Aldridge-Belson case, administrative consideration had concluded. So let's say we disagree with you on that. You keep repeating that, but I don't think that's right. So why, even after November 1, should we excuse your failure to ask for a scope inquiry? It's not our, what basis would we ask for a scope inquiry? Again, we have no reason to believe that the materials brought into India were from China or from any other country. I mean, this is the point, right? There's not very many factual outcomes here. You know, I know you're making the argument, one, that, you know, wherever the citric acid came from, it was substantially transformed in India. That's one argument. That's something you can make in a scope transformation. Or there's a factual argument that the citric acid was produced somewhere other than China. You can make that argument, but the facts can be uncovered either through a protest under A or through a scope ruling. You know, this suggestion that, oh, well, let's wave our hands in the air because we have no idea where the citric acid comes from, well, we can figure out where it came from. And it either came from China or it came from elsewhere and was either substantially transformed under the law or not. I don't see how any of those arguments can't be got at either under a protest under A or scope ruling under C. Tell me why I'm wrong. OK, well, when you go for a scope ruling under C, you say to us, where did the raw materials come from? We don't know. We made inquiries. All we know is that the Indian producer bought the raw materials from Indian suppliers. The country of origin of that, we don't know. Customs does not know the country of origin. And there's no evidence on the record that suggests that it's Chinese. So a scope determination would not have settled anything. Now, if you go to court on a protest, is there no is there no permissible mechanism to ask the Indian supplier of the citric acid where they sourced it from? We could not necessarily, but not under a scope determination, no. I mean, that question was asked by customs and the Indian supplier said we sourced it from Indian vendors. Where those Indian vendors got it from, we don't know. I've taken up all your time. So if you want to, I think I've even ran through your rebuttal, but it's presuming we give it back. I don't have any further questions for you. All right, then I reserve my time for rebuttal. I would point out that if you can't rush a liquidation in the time period, customs will always have the ability. If they could develop evidence, number one, that the raw materials were from China, and number two, an argument that the operations in India did not take it out of the scope of the Chinese order, they could have initiated a penalty investigation under Section 522 of the Tariff Act. And that would have required customs to come forward with some evidence of the Chinese origin of those materials. Okay. I reserve the rest of my time for rebuttal. Thank you. You have none, but we'll restore three minutes of rebuttal. Let's hear from Mr. Kerlin. I appreciate it, Your Honor. Mr. Kerlin, good afternoon, Judges. Sorry, Mr. Kerlin. I'm jumping in very quickly, but before you proceed to your main argument, can you just address that last point that there's no way we can figure out where the citric acid came from in a scope ruling? We didn't really talk about it in a protest case, but is there a mechanism for either customs or commerce or the importer to find out where that Chinese supplier sourced its citric acid from? And can I just add a piece to that question? I'm sorry, Judges, but also add, I think part of that question is, who has the burden to prove what in this circumstance? That's what I'd like to know. Who has the burden to establish the country of origin in these circumstances? Sure. Sure, Your Honors, and may it please the Court. The short answer to Judge Hughes's question is yes. And really, that connects to my chief argument here, because what this whole milieu suggests it emphasizes why this is not an appropriate Section 1581I case, because TRI's arguments on appeal are continually alluding to merit issues, which are quintessentially the province of either a Section 1581A protest or a Section 1581C scope proceeding. I think in direct response to Judge Hughes's question, the more appropriate venue for that kind of inquiry would be the Section 1581 protest, because that is the mechanism that someone has to challenge the factual determination, like, where does the citric acid actually come from? It's subject to full discovery and de novo review at the Court of International Trade. And that means that there's full discovery procedures applied to this question that TRI keeps alluding to of where its citric acid actually originated from, including presumably the ability to ask the original supplier. And then however that goes, the parties on both sides of the protest have, as in any litigation, have the best evidence that they have for their positions. The trial court decides it, and if necessary, there can be an appeal to this court. But that question is quintessentially what gets resolved as best it can in a Section 1581A protest. I do think there is a method for this issue to be addressed in a Section 1581C scope proceeding as well, although I think that would be... Judge Chen, this area of law is pretty confusing for me. I do have... Here's my first question. Assuming for the moment that the substantial transformation kind of analysis has to be done by commerce through a scope ruling and not through a protest, then would an importer like TRI here, if it wanted to challenge whether the monohydrate came from India or China, have to do that through a protest, but then whether the monohydrate, when it got converted into the imported merchandise, whether that was a substantial transformation, it would have to seek a scope ruling to commerce? So would it actually have to bifurcate its appeal? That's correct, Your Honor. They make essentially two different merits arguments. Could those be done concurrently, or would one have to wait for the other? The short answer to your question, Your Honor, is I think the CIT would have procedures to deal with that in a way that made efficiency and sense. For example, if they thought that their best argument was the scope substantial transformation argument, they could stay the protest and not deal with, does it come from China? If they say, well, if we win the scope argument, we win anyway. I don't know whether the court would be willing to consolidate the cases. But I think, although it's unfortunate that they raise two separate different merits issues that deal with two different mechanisms, I think there would be ways for the trial court to deal with that issue. Is it fairly common for this sort of thing to happen, where an importer has got multiple issues with a customs ruling on hitting them with duties and then have to go through both routes in order to get all those issues resolved? I don't know the answer to that, Your Honor. I think it certainly can happen, and the trial court deals with that issue. It's certainly extremely common, as one can see in the Bell Supply decision, that customs makes an initial country of origin determination, and then if a party disagrees with that and goes and gets a scope inquiry. I think maybe the extra complication here is TRI's position that we don't know where the citric acid comes from, and you can't prove it from China. That's clearly an A case, but I think that's an extra wrinkle. What this court has said in Sunpreet- Mr. Kerlin? When you- Yes. Mr. Kerlin, let me just interrupt. You're talking about that point again, about the factual origin of this, and you say that their argument is customs can't prove it. I think that the Chief Judge asked you whose burden it is, and I'm interested in that too. When customs is looking at these entries and having a suspicion that the country of origin for the citric acid is China, not India, what kind of evidentiary requirement, if any, do they have before they put the importer on notice that they intend to classify this? Do they have to point to some evidence, or can they just tell the importer their entries are insufficient and they're going to classify it as from China unless the importer comes forth with evidence? Is there anything in the regulations or procedures of customs that tell us who gets to decide the evidentiary issue in the first place and who bears the burden? Yes. This was discussed in the cyber power systems case. We cited a page 42 of our brief. In a Section 1581A protest, the burden is on the protester on the evidentiary issue. There is nothing that prevents customs- Sorry, Mr. Kerlin. Maybe I'm not being clear. I get what happens after the protest is filed and the like, but when customs gets these entries from the importer that classify it as coming from India, and customs has suspicion that they're not properly classified, and they send out some kind of notice to the importer that says, we don't think these are right. We're going to classify it as coming from China. What kind of proof do they need to make that statement before they can send out that order? I mean, do they have to have some documentary evidence or is it just their suspicion or their view that the evidence supported by the importer is insufficient? Not after the protest has been filed and the like, but that first initial contact. I understand. I don't think there's any statutory or regulatory requirement about the type of proof that customs needs in order to make its initial determination, but where that issue is addressed is if someone does challenge it and files a protest, because there's, leaving aside where the evidentiary burden stands in that proceeding, because there is complete discovery and de novo review in that protest, it requires customs to lay its cards on the table and say, okay, here's the basis for our suspicion or here's the evidence we had in our possession that caused us to make that determination. And then there's discovery, so there's development of further evidence. And then despite the evidentiary burden, the CIT gets to look at the evidence that customs had and any further evidence that gets developed and say, okay, yeah, I think you've made your case or not. So in any event, the proper venue for that factual question to be resolved is quintessentially in the Section 1581A protest. On the other hand, and I don't want to complicate things too much here, but just to be clear, both customs and commerce have their own substantial transformation test. As we've noted, this is also page 42 of our record. If you're really just challenging customs' own substantial transformation analysis, that can be a factual question that's addressed in a protest, too. If they just want to say, customs, you got it wrong here, based on your test, this stuff should be considered substantially transformed, that could also be challenged in a protest. But this court has been clear throughout the Sunpreme litigation, and particularly Sunpreme 1, that if customs makes that initial determination and you disagree with it, this is page 11 93 of Sunpreme 1, that the proper remedy for you to pursue that is through a scope inquiry to commerce. If you say, our stuff is substantially transformed, it doesn't matter where it came from, it's a product of India, that the proper thing for you to do is file a scope request with commerce. And by the way, the reason that Sunpreme 3 dealt with all those issues in the context of a challenge to a scope ruling is precisely because Sunpreme 1 had found that it wasn't appropriate to do that in a Section 1581i case, and that's why those issues got resolved in a Section 1581c scope ruling case. And that applies, that certainly applies here. So the key factual issue, and there were, I think, several misstatements by counsel that I want to make sure I address, is did TRI, to the extent it wanted to argue that its goods were substantially transformed in India, and thus outside the scope of the China orders, did it have an appropriate opportunity to seek a scope ruling from commerce? And the trial court correctly found that the answer here was clearly yes. This is at page 23 to 24 of the trial court's ruling, the court held, at least as of October 3, 2018, TRI was on notice that CBP considered the subject entries to be of Chinese origin and subject to the citric acid orders. And that's clearly the case, right? There's an October 3, there's the October 3 email in which CBP forwarded its notice of action, where it said that we believe the citric acid is of Chinese origin and subject to anti-dumping and countervailing duty orders. The proposed change includes changing the entries to type 03. And then one important factual issue I wanted to correct there is that on that day, at October 3, 2018, which is more than 45 days out from liquidation, by the way, CBP, and this is in TRI's complaints, CBP suspended liquidation of the entries as of that day, while saying we think they're Chinese in origin and subject to the ADCBD orders. TRI quibbled that, well, you didn't list ADCBD when you suspended it as of that day. But as of that day, you could have sought a scope inquiry from Commerce, and it would have applied to those entries because they were suspended by CBD under the regulation. And parenthetically, I should add that really, TRI had the opportunity to seek a scope inquiry even earlier than that. They were arguing back in their letter that's in the record of pages 108 to 110 of the appendix, even in responding to CBP's initial request, they were arguing strenuously that their goods were substantially transformed in India. And logically, if they wanted to get a definitive answer to that question from Commerce, could have sought a scope ruling all along, but certainly by October 23. The record goes on. On October 24, after receiving materials from TRI, CBP came back. Mr. Curlin, I'm sorry to interrupt you, but time is short. Can I just go back to where I started and Judge Hughes picked up on, which is understanding the burden, because I have an intuition that the incentive to go on the I route has something to do with who's got the burden to do what when. So even though your answer to Judge Hughes, which is you get a trial de novo before the CIT, that doesn't quite answer the question of burden. So in a situation such as this, is customs allowed to apply kind of a presumption that a particular product, because of what it knows about manufacturing around the world, that a particular product originated in China? I think the answer to that is no, Your Honor. But I want to be clear about this. This is in the Cyber Power Systems decision of page 42 of our brief. The burden in an A proceeding does lie with the protester. So they would have the burden to show in that context that their goods were not from China. But I don't think customs- And where's the burden under R? That's significantly different than under proceedings under I, right? I don't think, because these aren't proper I proceedings, I don't think there's been any explanation of who bears the burden. But I think you're right. I take Your Honor's point, and it emphasizes why this case really isn't an appropriate I case. Because I don't doubt that TRI prefers to have this issue reviewed as an ATA challenge on an alleged administrative record, rather than having these claims subject to the full discovery that would occur in a 1581A case. But merely because TRI has the evidentiary burden in that context doesn't mean that in that de novo review kind of full discovery context, that CBP isn't going to be required to disclose, to submit as part of discovery, whatever evidence it has that the goods are from China, and then evaluate that for what it's worth. And I don't think flimsy evidence is necessarily going to stand up in a 1581A case just because of the evidentiary burdens. One final point, just to address another question. In the 1581C context, that's subject to all the facts available and AFA rules that this court is familiar with. So if they're saying our stuff is substantially transformed, Commerce can also ask in that context TRI to contact its suppliers, and it can judge whether TRI and its suppliers have cooperated to the best of their ability in terms of trying to get the information where the acid is from. So that- Apologies. It appears that Judge Chen has dropped from the call. One second for me. And has a question for Mr. Kerlin. Yeah, just a quick process question. When Customs sends out requests for information to find out the country of origin, can't it just specifically ask why is this monohydrate from China or India as opposed to China? Thank you, Ronald. I think that that's essentially what Customs was getting at. I mean, it asked for all of the production and process information, and that's aimed towards figuring out where this stuff comes from. I don't know. I don't think they specifically said, well, why doesn't this come from China rather than India? But they- and frankly, I think, you know, they weren't in necessarily an accusatory mode. They were in an information gathering mode. So you know, they said, tell us about this stuff and what it is and how it's produced, and then looked at that information. And TRI's answer was, you know, again, to emphasize that TRI believed that this- what Customs ultimately determined to be a drying process affected a substantial transformation. And so this product was not only from India for purposes of ADCBD, but also from India and, in that sense, eligible for special preference under the generalized system of preferences, GFP. And Customs ultimately took that information and looked at it and said, no, we don't think it is substantially transformed. I think we're just- you're just removing water, soluble water, from citric acid. And so, you know, we believe this is a product of China. We don't think it's substantially transformed. And we're going to apply ADCBD duties. And that's what it said, not only on October 3rd, but then it came back after that testing on October 24th. And- Okay, thank you. You said the same thing. I got the answer. Thank you. Okay, thank you. Thank you, Your Honors. Mr. Kerlin, we'll hear from Mr. Peterson again for a rebuttal. Okay. Thank you. I'd like to address one of the questions that Judge Chen asked about 1514A jurisdiction. What if we went into court on a protest? Well, let's suppose we did. And let's suppose, in the course of that proceeding, some evidence surfaced that the monohydrate product was of Chinese origin. Okay. We're not done then. The court has to make a determination of whether that monohydrate remains within the scope of the Chinese order when it undergoes the operations in India. Now, first, it has to consult the scope of the order. Some orders talk about produced in China, whether or not further processed outside. So the scope of the order itself might make a substantial transformation test irrelevant. And then if it's not, then the court has to go through the question of, is this an anti-circumvention? Now, Congress intended that to be done by the Commerce Department on an administrative record subject to a deferential standard of review in the courts. It did not intend that to happen in a 1581A case. Did anybody on your side ask Posey where they get the monohydrate? Yes, we did. And they didn't have it. In fact, I think Judge Hughes had made a comment about asking about where a Chinese supplier got its material. But there's no evidence of any Chinese supplier in this case. Yes, we did ask Posey in an effort to provide the answer to customs. What did Posey say? Yeah. But all they knew is they had it from Indian suppliers, and their Indian suppliers could not give them more information. Okay, now, but again, if we get into an A case, you don't want to have scope determination being made by a judge instead of the Commerce Department on a de novo record instead of analyzing the facts Commerce is supposed to do. That was never intended. Now, as to the 1581C question, the court has said, well, customs suspended liquidation. You had time to get a scope ruling. Well, I don't know. Is 36 days enough time to get a scope ruling? What if it was 15? What if it was 10 before they liquidated? But another important question here is, did customs have the power to suspend liquidation at all? Because with respect to the period that these entries had been made in, customs had ended the suspensions of liquidation back by August 1st and directed liquidation, no change liquidations of entry of this merchandise. So I really question whether customs even had the power to suspend. Final point, in bringing the case under eye, we're not looking for scope determination. We're looking to set aside action that was done without regard to administrative procedure. If this was a Commerce call, they didn't do it in accordance with their procedures. If this was a customs call, it was ultra veris. The relief we're asking for under the APA is to determine who took the action, set the action aside as illegal, and what will follow is that our entries will have been deemed liquidated by operation of law as they were entered. I think it's important to make that clear. Just one final question, Mr. Peterson. Sorry, but I neglected to ask you earlier. I didn't find in your reply brief a response to the government's alternate argument for affirmance that you hadn't stated a claim upon which relief could be granted. Did you respond to that at all? What am I missing? Well, I don't know. The court below never reached that. As you know, Your Honor, the court dismissed for lack of subject matter jurisdiction. So to the extent that a 12B6 motion may have been interposed below, it was not ruled on by the court. Okay. Thank you. We thank both sides, and the case is submitted. That concludes our proceeding for this morning. The Honorable Court is adjourned until this afternoon at 2 p.m.